David B. RICHARDSON, et al., Plaintiffs,

v.

U.S. NEWS & WORLD REPORT, INC., et al., Defendants.

Civ. A. No. 85–2195.

United States District Court, District of Columbia.

July 7, 1986.

See also 623 F.Supp. 350.

E. Roger Frisch, New York City, George A. Bangs and Joseph M. Butler, Rapid City, S.D., and Raoul L. Carroll, Washington, D.C., for plaintiffs.

Richard J. Leighton and Avis Black, Washington, D.C., for defendant-intervenor Save the Fund.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Thomas J. Catliota and Jonathan T. Cain, Washington, D.C., for U.S. News, Madana Realty.

Lawrence Latto, William Galeota and Julie Melamud, Shea & Gardner, Washington, D.C., for Profit-Sharing Plan.

Richard J. Wertheimer, Hadrian Katz and Edward Wolf, Washington, D.C., for Directors.

Willis B. Snell, Willard K. Tom, Steuart H. Tomsen and Eric N. Miller, Washington, D.C., for American Appraisal Associates, Inc.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

On July 10, 1985, plaintiffs filed this action against their former employer, U.S. News & World Report, Inc. ("U.S. News" or "Company"), a weekly news magazine, as well as against eight of its former directors, the U.S. News Profit-Sharing Plan ("Plan"), and American Appraisal Associates, Inc. ("American Appraisal"), an independent appraisal firm. They charge that defendants collectively suppressed the value of the retirement benefits that they received upon separation from the Company through their participation in the Plan and through resale of shares of common stock issued them in connection with a stock bonus plan.

Plaintiffs [1] are, with one exception,[2] former employee-shareholders of U.S. News, who retired from U.S. News in 1982. Employees who had separated from the Company between 1974 and 1981 instituted a class action suit against these same defendants in February 1984, *Charles S. Foltz, et al. v. U.S. News & World Report, Inc., et al.,* C.A. No. 84–0447. The two cases were consolidated for pretrial and trial by Order of March 3, 1986.

Currently before the Court are defendants' motions for summary judgment. For the reasons set forth below, the Court **grants in part** and **denies in part** those motions, as follows:

(1) the claims of plaintiffs Haller, LeCompte, Stifel, Strube, and Truitt for benefits due under the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B), for breach of the fiduciary duty of care under ERISA § 502(a)(3), and for negligence are time-barred;

(2) plaintiffs' claims for securities and common-law fraud are dismissed in part;

(3) plaintiffs' claims under ERISA § 502(a)(3) are dismissed in part; plaintiffs' claims under ERISA § 502(a)(1)(B) that are not time-barred may proceed to trial; and

(4) plaintiffs' common-law claims are dismissed in part.

## BACKGROUND

The facts leading up to the filing of *Foltz,* as well as the general background of this litigation, have been extensively treated elsewhere.[3] A few of those facts, how-

---

**1.** Plaintiffs are David B. Richardson, Luther A. Dawson, Del Truitt, George H. Mikesell, Joseph B. LeCompte, Jr., Martha B. Strube, Dorothy G. Haller and Richard P. Stifel.

**2.** Plaintiff Dorothy G. Haller is suing as the personal representative of Ellis M. Haller, a U.S. News employee who died in 1981. Because his bonus shares were repurchased by U.S. News in that year, he is a member of the plaintiff class in *Foltz, et al. v. U.S. News & World Report, Inc., et al., see infra,* as to claims relating to the stock

bonus plan. His Plan account, however, was not settled until 1982.

**3.** *See* this Court's prior opinions at 627 F.Supp. 1143 (1986); 613 F.Supp. 634 (1985); and 608 F.Supp. 1332 (1985), that of the Court of Appeals, 760 F.2d 1300 (D.C.Cir.1985), as well as the recent Memorandum Opinions of June 12, 1986 in *Estate of Ben Grant v. U.S. News & World Report, Inc., et al.,* 639 F.Supp. 342 and in *Foltz,* 111 F.R.D. 49 (1986).

ever, need to be restated, if only in barest outline.

Between the time of its reorganization in 1962 and its sale in 1984, U.S. News was an entirely employee-owned company. Pursuant to the Articles of Incorporation, employees were issued, under a stock bonus plan, shares of non-transferable common stock at regular intervals. In addition, employees received an undivided interest in the Profit-Sharing Plan, in accordance with a formula based upon salary and term of service. Upon separation, each employee was required to offer his bonus shares back to the Company for repurchase and was entitled to liquidate his Plan account.[4]

The price that a retiring employee received per share of bonus stock was based upon annual valuations conducted by American Appraisal, in accordance with Article Fifth (e) of the Articles of Incorporation. The per share value of the Company's stock also determined the value of each employee's interest in the Plan, whose major asset was a 50,000 share block of U.S. News stock.[5] In arriving at a value for the Company as a whole, American Appraisal gave some consideration to U.S. News' extensive real estate holdings in the West End of Washington, D.C.

While the real estate did not always figure highly in the appraisal, by 1981 sufficient headway had been made in developing the U.S. News holdings that American Appraisal valued the real estate separately from the operating business of the magazine. In that year, a series of six joint venture agreements were entered into between U.S. News and Boston Properties, Inc., whereby U.S. News assigned its real estate holdings to Boston Properties, in exchange for a 50 percent equity interest in the joint ventures. As a result of the anticipated profitability of the joint ventures, the appraised value of the company's stock increased more than three-fold over its 1980 value of $152 per share.

In 1984, U.S. News, including its interest in the joint ventures, was sold to Mortimer Zuckerman, a real estate and publishing entrepreneur and principal of Boston Properties. The sale price of $176 million meant that current employees of U.S. News would receive approximately $2,800 per share for their interest in the Company. Plaintiffs, who received only $470 per share based upon the 1981 year-end appraisal, believe that the value of the stock had been previously suppressed, principally by a conservative treatment of the real estate and by a refusal to value the 50,000 share block held by the Plan on a control-premium basis. In addition, plaintiffs allege that U.S. News fraudulently withheld information concerning its real estate development plans, including a "secret" intent to sell the Company, from its employees and from American Appraisal and that U.S. News conspired with American Appraisal to arrive at a "negotiated" value for its stock.

Corresponding to these sets of facts, plaintiffs bring claims [6] against U.S. News, the directors, and American Appraisal for securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, breach of fiduciary duty in violation of section 404(a) of ERISA, 29 U.S.C. § 1104(a),[7] and for common-law fraud. Plaintiffs also bring against only

---

4. The liquidation could take three forms: a lump-sum cash payment, an annuity, or continued investment in the Plan.

5. The Plan also maintained a modest portfolio of investment securities and received cash contributions from U.S. News.

6. Plaintiffs' Second Amended Complaint, filed February 3, 1986 in order to facilitate consolidation with *Foltz*, is, by stipulation of the parties approved by the Court on March 3, 1986, to be read consistently with the rulings set down in this Court's Memorandum Opinion of January 15, 1986, 627 F.Supp. 1143 (1986), disposing of various legal issues in connection with the *Foltz* litigation.

7. Plaintiffs seek to enforce the provisions of section 404(a) by an action under section 502(a)(3), 29 U.S.C. § 1132(a)(3), which this Court has interpreted as allowing such relief. *See Foltz*, 627 F.Supp. at 1165–68.

U.S. News and its directors claims for common-law breach of fiduciary duty, unjust enrichment, and negligence. Against the Plan plaintiffs' claim is limited, as it must be, to an action for benefits due under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

## ANALYSIS

Defendants move for summary judgment on several grounds. All defendants charge that a number of the claims asserted are time-barred. U.S. News, the directors, and American Appraisal also urge the Court to hold that there is insufficient record evidence to support a rational inference of fraudulent conduct on which to premise a claim for securities or common-law fraud. Those defendants further argue that plaintiffs' ERISA claims against them will not withstand scrutiny, whether they are based upon intentional or negligent conduct. Finally, U.S. News and the directors contend that the claims for common-law breach of fiduciary duty and unjust enrichment, premised as they are upon defendants' alleged intentional conduct, must fail for the same reasons as the fraud claims, and that plaintiffs' negligence claim similarly is as factually barren as their ERISA claim.

In brief, plaintiffs' claims can be grouped together into two categories. The first category encompasses those claims premised upon negligent, imprudent, or arbitrary conduct: plaintiffs' claims under ERISA § 502(a)(1)(B) and, possibly [8] § 502(a)(3), as well as their negligence claim. The second category includes those claims grounded in fraudulent or willful conduct: plaintiffs' claims for securities and common-law fraud, intentional breach of fiduciary under ERISA § 502(a)(3), common-law breach of fiduciary duty, and unjust enrichment.

The facts underlying claims in the first category speak to whether U.S. News and its directors provided American Appraisal with adequate information, whether American Appraisal properly conducted the appraisal, and whether American Appraisal's work was properly scrutinized by U.S. News. Facts suggested to support claims in the second category surround U.S. News' alleged withholding of information from its employees and from American Appraisal, particularly a "secret" intent to sell the company, and an alleged conspiracy between U.S. News and American Appraisal to arrive at a "negotiated" value for the magazine's stock. Keeping separate these two sets of facts, together with the corresponding categories of claims, aids greatly in an analysis of defendants' motions and of the record.

## A.

### STATUTE OF LIMITATIONS

**1. Do plaintiffs have one or two causes of action?**

From the foregoing discussion, it appears that plaintiffs may actually have two causes of action, one for improperly calculated benefits, and one for wrongfully and willfully withheld benefits. The question rises to crucial importance in analyzing whether any of plaintiffs' claims are time-barred, or whether the statute of limitations must be tolled under the doctrine of fraudulent concealment as to some or all of them.

It is undisputed that the claims of some of the plaintiffs, as well as the securities claims of all of them, are outside the relevant limitations periods.[9] To come, then, within the ambit of tolling doctrine, plaintiffs must demonstrate that (1) defendants engaged in some fraudulent or deceptive course of conduct that successfully concealed facts underlying their cause of ac-

---

**8.** Although plaintiffs' claim under ERISA § 502(a)(3) is pleaded in terms of intentional or willful conduct, a liberal reading of their complaint would contemplate a charge for breach of the fiduciary duty of *care* under ERISA § 404(a), a negligence-based claim. *See infra* at 608; *see also Massachusetts Mut. Life Ins. Co. v.*

*Russell,* —— U.S. ——, 105 S.Ct. 3085, 3091 n. 10, 87 L.Ed.2d 96 (1985); *Donovan v. Cunningham,* 716 F.2d 1455, 1463–64 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Foltz,* 627 F.Supp. at 1175 & n. 74.

**9.** *See infra* at 600–601.

tion, and that (2) they were not on notice of those facts, despite (3) the exercise of due diligence. *Hobson v. Wilson,* 737 F.2d 1, 33–36 (D.C.Cir.1984), *cert. denied sub nom. Brennan v. Hobson,* —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

■ The question that then arises is what constitutes plaintiffs' "cause of action." To impute notice to a plaintiff such as to start the statute running, it must be that the plaintiff was aware of "facts giving notice of the particular cause of action at issue, not of just any cause of action." *Hobson,* 737 F.2d at 35. In this connection, counsel for the Plan reluctantly raises the possibility that plaintiffs' cause of action indeed may be two-fold, with the result that notice of facts underlying one will not impute notice of the existence of the other. In other words, merely because plaintiffs may have been aware that the real estate may not have been properly accounted for in the appraisals would not start the clock running on a claim that defendants "negotiated" a per share value for the Company's stock. The most that could be said, then, is that a claim for improperly, as opposed to wrongfully, determined benefits would be time-barred.[10]

■ As the Plan's counsel suggests, a look at *Richards v. Mileski,* 662 F.2d 65 (D.C.Cir.1981), may prove instructive. In *Richards,* the plaintiff was coerced into resigning his government position by what his superiors held out to be reports of his homosexual activity. Although Richards of course knew at the time of his resignation that the reports were false, he did not know of facts—learned some twenty years later—suggesting that his superiors had fabricated or at least had maliciously utilized the false reports to secure his resigna-

tion. Finding that a claim for intentional wrongdoing, based upon the subsequently learned facts, had been fraudulently concealed by the defendants, the court held that awareness at the time of his resignation of the alleged reports' falsity was insufficient to put Richards on notice of a claim premised upon malicious conduct. 662 F.2d at 69. Within the limitations period running from the time of his resignation, Richards could have only brought a claim for wrongful discharge, an entirely different claim from the one actually brought much later. *Id.*

The Court finds the rationale of *Richards* to be persuasive. As outlined above, the facts underlying plaintiffs' claims for intentional and fraudulent conduct are distinct from those supporting their claims premised upon lesser degrees of fault. To impute notice to them of the former claims, based upon knowledge of facts underlying the later, would would be to attribute to them a prescience beyond that which the *Richards* court deemed appropriate.[11]

Accordingly, the Court holds that, for statute of limitations purposes, plaintiffs have two causes of action, as outlined above.

### 2. Claims that would otherwise be time-barred

Plaintiffs LeCompte, Strube, and Truitt, liquidated their Plan accounts and resold their bonus shares prior to July 10, 1982, or more than three years before filing suit. Ellis M. Haller, the decedent of plaintiff Dorothy G. Haller, had his bonus shares repurchased upon his death in 1981; his Plan account was settled in May 1982.[12] Plaintiff Stifel resold his bonus shares in April 1982, but continues as a participant in

---

**10.** In analyzing whether plaintiffs have one or two causes of action, one test that suggests itself is whether a second claim for wrongfully withheld benefits would be precluded by *res judicata* upon the litigation of a prior claim for improperly calculated benefits. However, such a test for determining the unity of a cause of action, based upon the rule against the splitting of claims, *see* 1B *Moore's Federal Practice* ¶ 0.410[1] (1984), has been squarely rejected in this Circuit. *Wilson v. Johns-Manville Sales*

*Corp.,* 684 F.2d 111, 117–18 & n. 36 (D.C.Cir. 1982).

**11.** *See infra* at 601–602.

**12.** *See supra* note 2. As noted, Mr. Haller's interest in the stock bonus plan forms a basis for his inclusion in the *Foltz* class and consequently is not a subject of this suit.

the Plan to this date. Because the claims of these plaintiffs accrued more than three years before the instant suit was filed, any cause of action for violation of ERISA and any common-law claims would be time-barred absent tolling of the statute. 29 U.S.C. § 1113; D.C.Code Ann. § 12–301(7), (8) (Michie 1981).[13] In addition, because the limitations period in the District of Columbia for a claim for securities fraud is two years, *Wachovia Bank & Trust Co. v. Nat'l Student Marketing Corp.*, 650 F.2d 342, 346–48 (D.C.Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981), the securities claims of the remaining plaintiffs would be otherwise untimely.

### 3. Tolling as to claims involving elements of intent or fraud

As outlined above, one category of claims brought by plaintiffs—those for securities and common-law fraud, breach of fiduciary duty under ERISA and the common law, and unjust enrichment—derive support from defendants' allegedly intentional or fraudulent conduct. That conduct is said to involve (1) the failure of U.S. News and its directors to provide American Appraisal with all information relevant to the magazine's real estate development plans; (2) those defendants' failure to provide that information to the employees; (3) those defendants' failure to disclose their "secret" intent to sell the company, and (4) the conspiracy entered into by those defendants and American Appraisal to arrive at a "negotiated" value for the magazine's stock.

Item (1) above will be discussed later in the context of defendants' motion for summary judgment on the merits of plaintiffs' securities and fraud claims. Suffice it to say now that, because the record reveals no support for the proposition that any relevant information was withheld from American Appraisal, the Court need not reach the question of whether a claim premised upon such an allegation is time-barred. Item (2) is discussed in connection with whether plaintiffs' claims for other than fraudulent or intentional conduct are time-barred.

Turning to items (3) and (4), the Court notes that, if there is any substance to plaintiffs' allegations, they certainly could not have been on notice of the facts in question.[14] It is not argued by defendants that plaintiffs knew of the key fact that plaintiffs say supports an inference of an intent to sell the company—the acceleration of certain deferred compensation rights or "phantom stock" in March of 1982, supposedly in anticipation of an imminent sale. Nor do defendants suggest that plaintiffs were privy to the communications that took place between representatives of U.S. News and American Appraisal in connection with the conduct of the 1981 year-end appraisal, from which plaintiffs infer a "negotiated" valuation.

If plaintiffs cannot be held to have been on notice of those facts outlined above, the issue is whether there was any fraudulent concealment of those facts. Moreover, because any concealment was effected by the nature of the alleged wrongs themselves—in other words, because of the element of secrecy alleged—the issue becomes simply one of whether the conduct charged was fraudulent or not.[15] The relevant inquiry thus merges with a discussion of the merits of plaintiffs' claims and will be deferred accordingly.

Accordingly, the Court holds that none of plaintiffs' claims for securities or common-

**13.** The limitations period provided by ERISA for a claim for breach of fiduciary duty is three years if a potential plaintiff was on notice of his cause of action. 29 U.S.C. § 1113(a)(2)(A). Because the Court finds that these plaintiffs had such notice, the three year period does indeed apply.

**14.** The Plan seems to recognize that notice is not the issue as to plaintiffs "fraud-based" claims, for that defendant addresses those claims separately in its reply memorandum *on the merits*, apparently conceding that plaintiffs could not have been *aware of* the conduct in question, quite apart from whether it was indeed fraudulent.

**15.** In other words, the wrongs allegedly perpetrated by defendants were "self-concealing." *See Hobson,* 737 F.2d at 33.

law fraud, intentional breach of fiduciary duty under ERISA § 502(a)(3), common-law breach of fiduciary duty, or unjust enrichment are time-barred.

**4. Tolling as to claims not involving elements of intent or fraud**

It is axiomatic that a wrong that itself is not a fraud cannot constitute a "self-concealing" wrong within the scope of the fraudulent concealment doctrine. *See Hobson*, 737 F.2d at 33 & n. 102. For the statute to be tolled, then, such a wrong must have been concealed by subsequent fraudulent acts. *Id.* Hence, to prevail on their assertion that their claims based on other than fraudulent conduct were fraudulently concealed, plaintiffs must demonstrate that defendants engaged in a course of conduct to cover up the wrongs allegedly committed. Yet plaintiffs have never argued that any such *subsequent* course of conduct occurred. Even if they did make such an argument, it would be to no avail, for not only does the record reveal no evidence of a scheme to cover up the wrongs alleged, but it indicates, rather, that at least some of the plaintiffs were on notice of facts underlying their claims. And such notice, of course, would defeat any claim of fraudulent concealment. *Hobson*, 737 F.2d at 35. Conversely, in the absence of any course of fraudulent conduct designed to conceal a cause of action, notice on plaintiffs' part need not be shown in order to defeat a claim that the statute should be tolled.

Whatever may be said of the degree to which U.S. News kept its employees apprised of the status of its real estate development plans during the *Foltz* class period, *see* 627 F.Supp. at 1152, by 1981, when the joint ventures were entered into, efforts at disclosure were made sufficient to negate any inference that U.S. News was attempting to keep the value of its real estate holdings secret. Indeed, any such attempt would have been futile. As early as September 1981, the Washington Post published an article outlining the business successes of U.S. News, including its ambitious real estate joint venture with Boston Properties. Nor was media coverage limited to that one piece. *See* Exhibit B to U.S. News and Director Defendants' Reply to *Richardson* Plaintiffs' Opposition to Motion for Summary Judgment.

Moreover, disclosure was not confined to reports from outside sources. In March 1982, U.S. News held a series of seminars designed to inform its employees of the impact—because of the three-fold increase in the appraised value of U.S. News' stock—that the joint ventures would have on their retirement benefits. During the course of the seminars, employees were told that the real estate had previously been carried on the books at only "assessment value," Statement of the Profit-Sharing Plan of U.S. News & World Report, Inc., of Material Facts as to Which There is No Genuine Dispute, Appendix 5 ("Plan App. 5") at 1 (Transcript of March 23, 1982 Profit-Sharing Seminar), that the fruition of U.S. News' real estate development plans had resulted in "a sudden surge in the stock price," *id.* at 6, and most importantly that American Appraisal's approach in valuing the real estate—even at that late date—was fairly conservative. *Id.* at 17–18, 29. In addition, in a standard memorandum to retiring employees outlining the options available to them for liquidation of their Plan accounts, U.S. News informed Plan participants that its real estate development "may cause the Company stock to increase substantially in value." Haller Deposition Exhibit No. 4 (January 14, 1981). Thus it appears that, not only did U.S. News not attempt to conceal the value of its real estate, it revealed that it might be worth even more than its appraised value. Such disclosure is certainly inconsistent with a scheme to fraudulently conceal a plan to depress the value of the magazine's stock through an undervaluation of its real estate.

As stated earlier, whether plaintiffs were actually on notice of the real estate development plans is irrelevant, as long as there exists no record evidence from which an inference of fraudulent concealment may be drawn. In other words, defendants

need not demonstrate that all of the plaintiffs whose claims would otherwise fall outside the limitations period were actually at the profit-sharing seminars, or that they read pertinent media accounts of developments in the West End.[16] It is enough to demonstrate that their ignorance was due to circumstances not caused by any fraudulent conduct on defendants' part. The Court finds that defendants have met their burden.

Accordingly, the claims of plaintiffs Haller, LeCompte, Stifel, Strube and Truitt for benefits due under ERISA § 502(a)(1)(B), for breach of the fiduciary duty of care under ERISA § 502(a)(3), and for negligence are dismissed as untimely filed.

### B.

### CLAIMS FOR SECURITIES AND COMMON-LAW FRAUD

As stated previously, plaintiffs' claims for securities and common-law fraud are predicated upon wrongful conduct of U.S. News and its directors in allegedly (1) withholding relevant information from American Appraisal concerning the real estate holdings; (2) withholding such information from U.S. News employees; (3) harboring a "secret" intent to sell the Company; and (4) "negotiating" a per share value for the Company's stock. Liability against American Appraisal is asserted in connection with item (4), as well as its general appraisal methodology.

Item (2) has already been discussed in connection with the untimeliness of plaintiffs' "non-fraud" claims; except in conjunction with items (3) and (4), there is no record evidence from which can be drawn an inference that defendants withheld relevant information from the U.S. News employees.

■ Similarly, because a defendant cannot be held liable under the securities laws when it has in fact disclosed the relevant material facts, *Foltz*, 627 F.Supp. at 1161–63, no claim for securities fraud will lie against American Appraisal to the extent that it arises out of aspects of that defendants' appraisal methodology that were fully disclosed in its report. Similar reasoning applies to plaintiffs' common-law fraud claims against American Appraisal.[17] Accordingly, the only possible claims for securities and common-law fraud that may be asserted against American Appraisal concern that defendants' involvement with U.S. News in the alleged "negotiation" of a final per share value.

Left for discussion, then, are items (1), (3), and (4), which will be taken up in turn.

### 1. Withholding information from American Appraisal

■ It is indisputable that U.S. News provided American Appraisal with all infor-

16. If actual notice were the standard, defendants would be at least partially successful in defeating plaintiffs' claims that their cause of action was fraudulently concealed. Plaintiff LeCompte, if no one else among those whose claims would be otherwise time-barred, actually attended the March 1982 seminar. Deposition (Nov. 14, 1985) at 60. He and plaintiffs Truitt and Stifel testified specifically that they attended the 1978 shareholder luncheon, at which American Appraisal's general methodology was outlined, including its use of a minority interest valuation. LeCompte Deposition at 18 (attended *all* the luncheons); Deposition of Del F. Truitt (Dec. 17, 1985) at 90–92; Deposition of Richard P. Stifel (Nov. 6, 7, 1985) at 156, 230–32. Plaintiff Haller testified that her husband usually attended the luncheons. Deposition of Dorothy G. Haller (Dec. 18, 1985) at 8. Mrs. Haller also testified that her husband told her that the magazine's real estate development would probably increase substantially the value of its stock. *Id.* at 29–30, 62–63. Finally, at least two of the plaintiffs in this group knew of the existence of the appraisal reports, which would have indicated in detail American Appraisal's methodology. LeCompte Deposition (Nov. 13, 1985) at 48; Truitt Deposition at 80.

17. Since an essential element of common-law fraud is the making of "a deliberate misstatement of fact ... with the intent to deceive another person," *Shear v. Nat'l Rifle Ass'n of America,* 606 F.2d 1251, 1259 (D.C.Cir.1979), American Appraisal's *disclosure* of its methodology must necessarily shield it from claims that it was attempting to *deceive* plaintiffs as to elements of that methodology. *See Foltz,* 627 F.Supp. at 1179.

mation relevant to the 1981 joint venture agreements. In claiming that U.S. News withheld information relevant to a valuation of its real estate, plaintiffs point only to the fact that U.S. News did not furnish American Appraisal with certain studies analyzing real estate development possibilities, prepared prior to the negotiation of the joint venture agreements. Included in this category of information were a study conducted by the law firm of Arnold & Porter dated January 28, 1981, analyzing real estate development and sale possibilities; discussions in April 1980 with the Oliver T. Carr Company concerning development of a portion of the magazine's excess real estate, and a report dated December 8, 1980, prepared by Julien Studley, Inc., again concerning possible development plans.

Plaintiffs have made absolutely no showing of any relevance that the above information would have had for an appraisal of U.S. News' interests in the joint ventures as they were actually formalized. Nor have they adduced any evidence indicating that the earlier reports were intentionally withheld, nor any motive on U.S. News' part for so withholding them.[18] In short, while plaintiffs have come up with a "fact," they have not demonstrated its materiality to the subject matter of this litigation. Accordingly, judgment for defendants will be entered as to this issue.

## 2. Harboring an intent to sell the company

█ Plaintiffs' claim that U.S. News and its directors harbored a "secret" intent to sell the Company, which was not revealed to American Appraisal, is supported—if at all—by an inference that awards of deferred compensation rights or "phantom stock" to certain of the directors were accelerated in anticipation of an imminent sale. While it is indisputably true that such acceleration did take place in March of 1982, it is not clear what can be made of it.

Defendants point out, first, that there are entirely innocent explanations for the acceleration of the awards. One such explanation is that, as indicated in the minutes of the Board meeting of March 9, 1982, there was concern that several "classes" of directors would be created by a maintenance of the then status quo, whereby awards were made in installments, requiring that newer directors "catch up" to their more senior colleagues. PX 320 at 12–14.[19] The other explanation is that, because the Plan was facing liquidity problems due to the sudden surge in the price of the magazine's stock, it was decided that all the directors should bear the same financial exposure in the face of uncertainty as to the future course to be taken by the company. Deposition of James H. McIlhenny (Aug. 1, 1984) at 10–11.

Defendants further maintain that the existence of any "secret" intent to sell U.S. News is rendered impossible by the presence in the record of certain objective evidence indicating that the Company would *not* be sold. First, the Company's long-standing policy of remaining employee-owned retained its vitality even in the face of the Plan's liquidity problems. While one solution proposed to alleviate the liquidity crisis was to sell the Company, management regarded this as an undesirable option. *See* Plan App. 5 at 1, 33 (March 23, 1982 Profit-Sharing Seminar). Instead, management sought to ameliorate the liquidity problem by amending the Plan to provide for the issuance of 15 year notes to retiring employees in lieu of lump-sum settlements. *Id.* at 3–8. The proposed amendment was filed with the Department

**18.** In their opposition to defendants' motions, plaintiffs apparently shift ground and contend that the earlier real estate studies had been withheld from the *U.S. News employees.* Whether or not these studies themselves were provided to the employees, by late 1981, U.S. News had made efforts to make its employees aware of the potential impact on their retirement accounts that a plan for development of the magazine's real estate might have had. *See supra* at 602–603.

**19.** "PX" refers to deposition exhibits designated by plaintiffs in the *Foltz* case.

of Labor for approval. To be sure, that filing might have been part of an elaborate hoax on the part of U.S. News management designed to cover up some secret plan to sell the Company while taking as much "cream" off the top as possible. Yet in the absence of any record evidence to support such a theory, no jury would be entitled to infer that any secret intent to sell existed at the time.[20]

The doubtfulness of plaintiffs' claim that such an intent to sell existed is further underscored by additional objective evidence that the Company was not for sale. Its ultimate purchaser, Mortimer Zuckerman, testified that he was consistently rebuffed during the course of offers to buy that he made between 1981 and 1983. Deposition (Oct. 31, 1984) at 25, 27–29. Although it is possible that he was turned down because his offers were not sufficiently enticing, he testified rather that "they did not choose to sell the company." *Id.* at 28.

Finally, one should note that the Company was not, in fact, sold until 1984. Consequently, even if an "intent" to sell existed, it was never brought to fruition and consequently could not have been relevant to an appraisal of the Company as of December 1981. Indeed, the American Appraisal representative who supervised the appraisal testified that only a firm plan to sell the Company in the immediately following year would have prompted any discussion concerning whether such a plan should be reflected in the appraisal. Deposition of John G. Russell (Aug. 21, 1984) at 276–77. The alleged withholding from American Appraisal of a vague and never-realized intent to sell certainly cannot form the basis of a fraud claim, especially when the Company was *not* sold at or subsequent to the time when the intent was said to have been harbored.

In sum, the only evidence available to counter the objective evidence that U.S. News was not for sale is subjective evidence based upon an inference that the phantom stock awards were accelerated in anticipation of a sale. Yet while all inferences must be drawn in favor of the non-moving party—here, the plaintiffs—in light of the objective record evidence, the acceleration of the phantom stock awards at most points towards avarice on the part of the U.S. News Board, not any intent to sell the company. In the absence of "persuasive evidence" tending to overcome the implausibility of plaintiffs' claim and the objective evidence to the contrary, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), summary judgment is appropriate on this issue.

Accordingly, defendants' motions for summary judgment are granted as to plaintiffs' claim that U.S. News and its directors were possessed of an intent to sell the company, which they withheld from American Appraisal and their employees.

### 3. Negotiation of a final per share value

■ Likewise, plaintiffs' claim that U.S. News and American Appraisal conspired to "negotiate" a final per share value for the Company's stock does not withstand scrutiny. While plaintiffs cite numerous portions of the record to support their claim, careful study of the relevant documents and testimony reveals no facts from which a jury could rationally infer that defendants engaged in conduct that was in any way fraudulent. Accordingly, defendants are granted summary judgment on this aspect of plaintiffs' securities and common-law fraud claims.

Under plaintiffs' theory, the "negotiation" involved three steps. First, U.S. News apprised American Appraisal of the liquidity problems faced by the Plan, *see*

---

**20.** *Plaintiffs' counsel as much as conceded during oral argument that he would attempt to develop his case through cross examination at trial, Transcript of Proceedings (May 13, 1986) at 72–73, 84–85,* yet at the same time stated that he was willing to "stand on the record" for purposes of the instant motions. *Id.* at 73. Counsel will not be permitted to embark on a fishing expedition at trial as to matters that will not presently withstand a motion for summary judgment.

PX 108, 175 (notes of January 27, 1982 meeting); Deposition of David T. Marshall [21] (Aug. 9, 1984) at 695, and also provided American Appraisal with a range of possible values of $400–$450, calculated by chief financial officer Ray Naimoli. PX 107 at 2 (notes of John G. Russell *re:* February 26, 1982 review with David T. Marshall); Deposition of John G. Russell (Aug. 21, 1984) at 364. Next, Mr. Russell and Mr. Marshall made some preliminary calculations, which they then conveyed to U.S. News. Finally, those preliminary calculations were adjusted downward in a series of steps, allegedly as a result of U.S. News pressure.

The first issue that must be addressed is the nature of the "preliminary" figures that American Appraisal gave to U.S. News. Plaintiffs contend that they were suggested final values, while defendants maintain that they were only partial totals that did not reflect the application of a minority discount. A review of the record bears out defendants' understanding of the figures arrived at separately by Mr. Marshall and Mr. Russell, from which a range was developed and conveyed to U.S. News. Mr. Marshall calculated that the stock was worth $620 per share, PX 107, but that figure did not include a minority discount. Deposition (Aug. 9, 1984) at 655–56, 658, 660; Deposition (Sept. 12, 1984) at 848–49; [22] *see also* Russell Deposition at 363. Mr. Russell arrived at a range of $545 to $580 per share, after discounting the value of the real estate at 20 percent to reflect a minority interest. PX 107; Deposition at 362–63. Mr. Russell then phoned a range of $550 to $625 in to Mr. Naimoli as preliminary estimates. *Id.* at 366–67. The figure representing the upper end of the range, taken from Mr. Marshall's calculations, did not reflect the application of a minority discount. *Id.* at 363. In short, at least a portion of the downward adjustment to

these preliminary figures was the result of a subsequent application of a minority discount, rather than of pressure from U.S. News.

It appears to be true, however, that the figure at the lower end of the range communicated by Mr. Russell, $550, was already discounted. Plaintiffs contend that this figure was then improperly cut back, until the final value of $470 per share was arrived at. Yet, as a matter of law, none of the adjustments to the preliminary figure amount to fraudulent conduct.

First, plaintiffs challenge the way in which American Appraisal treated rent that U.S. News would have to pay for its headquarters. Instead of netting out these future rental payments against the income that U.S. News was to receive from the joint ventures, and then applying a minority discount to the result, as he had done previously, the appraiser discounted the income alone and then subtracted the full present value of the rent. Marshall Deposition (Aug. 9, 1984) at 656–57. Yet while this may not have been the best of appraisal procedures, there is absolutely nothing in the record to suggest that it was part of a scheme to deliberately defraud plaintiffs. The uncontroverted testimony of Mr. Marshall is that he believed that he was following correct appraisal methodology. Deposition at 659, 664–66. The fact that use of another procedure would have resulted in a higher value, standing alone, will not support a claim for securities fraud. To cross the threshold on such a claim, plaintiffs would have to make some showing that the conduct complained of was in some way "manipulative or deceptive" within the meaning of the securities laws. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 474, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977). To the extent that the final treatment of the rental payments was disclosed in the ap-

---

**21.** Mr. Marshall, under the supervision of Mr. Russell, prepared the appraisal.

**22.** Mr. Marshall valued the operating business and real estate separately. Because the valuation of the former necessarily "was already minority interest," Deposition at 848, the question

is whether the real estate was similarly discounted for minority interest. It was not; however, the total value of the company was reduced by a 10 percent marketability discount. *Id.;* PX 107.

praisal report—which it was, *see* PX 21 at 25—the actions alleged as to U.S. News and American Appraisal could not be deemed deceptive. Nor can those actions be deemed "manipulative." "Manipulation" as a "term of art," *Santa Fe,* 430 U.S. at 476, 97 S.Ct. at 1302 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)), "refers generally to practices ... that are intended to mislead investors by artificially affecting market activity." *Id.* Even if the way in which the rental payments were ultimately treated was arrived at through some undisclosed process of negotiation, the end result—which was disclosed—could not have had the type of misleading or manipulative effect to which the securities laws are directed.

The second and third instances of misconduct alleged by plaintiffs offer even less support to their securities claim. They point to two adjustments to its methodology made by American Appraisal in order to maintain the per share value of $470, previously released in a draft report, in the face of a change proposed by Mr. Naimoli that would have increased the per share figure.[23] Yet because U.S. News suggested a change that would have *increased* the per share value, and because American Appraisal had no independent motive to depress the value of the U.S. News stock, it strains credulity to think that the adjustments made by American Appraisal give rise to any inference of fraud or collusion between that defendant and U.S. News.

While the Court is mindful that summary adjudication must not be used to resolve disputed issues of fact, it is also cognizant of the "integral" role of summary judgment in the Federal Rules in "secur[ing] the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P.

1). In order to survive a motion for summary judgment, the nonmoving party must produce "sufficient evidence ... for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Celotex,* 106 S.Ct. at 2552. If the evidence proffered by the nonmoving party is "merely colorable," or "not significantly probative," summary judgment may be granted. *Liberty Lobby,* 106 S.Ct. at 2511. In this proceeding, plaintiffs have suggested at best implausible bases to support their claim that U.S. News and American Appraisal conspired to deliberately suppress their retirement benefits by manipulation of the appraisal process. Accordingly, summary judgment is appropriate on this issue. *See Matsushita,* 106 S.Ct. at 1356–57.

### COMMON–LAW FRAUD

To the extent that summary judgment is properly entered for defendants on plaintiffs' securities fraud claims, it is even more appropriate with respect to their claims for common-law fraud. In the District of Columbia, fraud must be proved by "clear and convincing evidence." *Blake Construction Co., Inc. v. C.J. Coakley, Co., Inc.,* 431 A.2d 569, 577 (D.C.1981). In the face of such a heightened evidentiary standard, the nonmoving party must, as the bearer of that burden of proof, demonstrate the existence of facts such as would enable a rational jury to conclude that that party had met its burden at trial. *Liberty Lobby,* 106 S.Ct. at 2513. In short, to survive defendants' motions, plaintiffs would have to come forward with sufficient material facts to warrant a finding by the Court that a rational jury could conclude that they had proved fraud by "clear and convincing evidence." *Id.* Yet as discussed *supra,* plaintiffs have utterly failed in this regard. Accordingly, summary, judgment is granted

**23.** The adjustments were (1) an increase in the size of the minority discount from 33 to 35 per cent, Marshall Deposition at 653–54, and (2) the decision to give greater weight to one approach

to valuing the real estate over the other, when the two were averaged to arrive at a final value for the real estate. *Id.* at 715–20.

defendants on plaintiffs claims for common-law fraud, as well as their claims for securities fraud.

## C.

### CLAIMS FOR VIOLATIONS OF ERISA

Plaintiffs' ERISA claims straddle the dividing line between those of their claims premised upon fraudulent conduct and those premised upon merely negligent, imprudent, or arbitrary conduct. Clearly, a claim under ERISA § 502(a)(1)(B) falls into the latter category.[24] Plaintiffs' claim under section 502(a)(3), as noted, appears to be bifurcated into a claim sharing the same factual predicates as their claims for securities and common-law fraud, on the one hand, and their claim under section 502(a)(1)(B) and for negligence, on the other.

### 1. Section 502(a)(1)(B) claims

The Plan has not moved for summary judgment on the merits as to the sole claim against it. Moreover, counsel for the Plan has consistently conceded in oral argument that the propriety of the appraisal methodology employed is not an issue that may properly be resolved on summary judgment. *See, e.g.,* Transcript of Proceedings (May 13, 1986) at 56–59. Accordingly, a determination of whether the 1981 year-end appraisal was so erroneous as to support a claim for benefits due under ERISA § 502(a)(1)(B) must await trial.

### 2. Section 502(a)(3) claims

Insofar as plaintiffs rely upon allegations of intentional wrongdoing, as pressed in connection with their claims for securities and common-law fraud, to support a claim for breach of fiduciary duty under ERISA § 502(a)(3), they have tied the success of the latter claim to proof of fraudulent conduct. Hence, their claim under section 502(a)(3) is no stronger than their claims for securities or common-law fraud and must necessarily suffer the same fate.

Accordingly, to the extent that plaintiffs seek to support their claim under ERISA § 502(a)(3) by proof of the same facts adduced to support their claims for securities and common-law fraud, summary judgment is granted defendants.

However, while plaintiffs have apparently not sought to predicate liability for breach of fiduciary duty under section 502(a)(3) on the failure of U.S. News and the directors to adequately scrutinize the appraisal, *see* Second Amended Complaint ¶ 56–59, Memorandum of Points and Authorities in Opposition to the Motions for Summary Judgment of Defendants ..., at 39–40, such a theory would be supported by case law, *see Fink v. Nat'l Savings & Trust Co.,* 772 F.2d 951, 955–56 (D.C.Cir. 1985); *Donovan v. Cunningham,* 716 F.2d 1455, 1467–74 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), and may not be unreasonable as applied to the record in this case. Accordingly, should the evidence developed at trial warrant it, plaintiffs may be granted leave to amend their complaint in conformity to that evidence, pursuant to Fed.R. Civ.P. 15(b).

## D.

### COMMON–LAW CLAIMS

### 1. Breach of fiduciary duty

■ Plaintiffs' claim that U.S. News and its directors breached common-law fiduciary duties owed them seems to be predicated upon an allegation that they wrongfully concealed and used "inside" information as to the value of the Company's assets, to the detriment of the U.S. News employees. *See* Second Amended Complaint ¶¶ 70, 73. As discussed earlier[25] there is no record evidence that defendants concealed relevant information as to the value of U.S. News' assets, which presumably means its real estate holdings. Moreover, it is unclear how defendants could have used that

---

**24.** *See supra* at 599.

**25.** *See supra* at 602–604.

information to the detriment of plaintiffs, unless reference is being made to plaintiffs' theory that the directors "secretly" intended to sell the Company. But again, as discussed previously,[26] the record simply does not support such a theory.

Accordingly, summary judgment will be granted defendants as to plaintiffs' claim for common-law breach of fiduciary duty.

### 2. Unjust enrichment

Plaintiffs' claim that U.S. News and the directors were unjustly enriched through their "willful[ ] fail[ure] to appraise annually the true value of the assets of U.S. News and its subsidiaries," Second Amended Complaint ¶ 77, seems to be no more than a restatement of their claims for securities and common-law fraud. Accordingly, consistent with the disposition of those claims, *supra*, defendants will be granted summary judgment as to plaintiffs' claim for unjust enrichment.

### 3. Negligence

Plaintiffs' negligence claim is premised upon two breaches of duty.[27] First, U.S. News and the directors are said to have failed to apprise American Appraisal of information relating to the proper valuation of the Company's assets, presumably meaning its real estate. Second Amended Complaint ¶ 82. Yet as discussed,[28] there is absolutely no record evidence to support a claim that those defendants failed to provide American Appraisal with all relevant information. Second, U.S. News and the directors are said to have failed to scrutinize adequately the appraisal process. Second Amended Complaint ¶ 81. That claim may have some merit and would be analogous to a claim that those defendants breached their fiduciary duty of care under ERISA § 404(a).

Accordingly, defendants will be granted summary judgment as to plaintiffs' negligence claim, but only insofar as that claim is premised upon defendants' failure to furnish American Appraisal with information relevant to a valuation of the U.S. News real estate holdings.

## CONCLUSION

For the reasons set forth above, defendants' motions are granted in part, but only as to the following plaintiffs, claims, or factual issues, as specified herein:

### A. Statute of Limitations

The claims of plaintiffs Haller, LeCompte, Stifel, Strube and Truitt for benefits due under ERISA § 502(a)(1)(B), for breach of the fiduciary duty of care under ERISA § 502(a)(3), and for negligence are time-barred.

### B. Securities and Common-law Fraud

Defendants' motions are granted as to all plaintiffs' claims for securities and common-law fraud.

### C. ERISA

Plaintiffs' claims under ERISA § 502(a)(1)(B), *to the extent that they are not time-barred,* may proceed to trial. Summary judgment is granted defendants as to all plaintiffs' claims under ERISA § 502(a)(3), *except* insofar as those claims are premised upon a breach by U.S. News and the director-defendants of their duty to scrutinize adequately the appraisal.

### D. Common-law Claims

#### 1. Breach of fiduciary duty

Summary judgment is granted defendants on all plaintiffs' claims for common-law breach of fiduciary duty.

---

**26.** *See supra* at 604–605.

**27.** American Appraisal is also said to have breached its duty to competently conduct the appraisal. Second Amended Complaint ¶¶ 86–87. However, as noted *supra* at 598–599 &

note 6, consistent with the Court's Opinion in *Foltz,* no negligence claim is currently being asserted against American Appraisal.

**28.** *See supra* at 603–604.

### 2. Unjust enrichment

Summary judgment is granted defendants as to all plaintiffs' claims for unjust enrichment.

### 3. Negligence

Summary judgment is granted defendants on all plaintiffs' negligence claims, *except* insofar as they are premised upon the failure of U.S. News and the director-defendants to scrutinize adequately the appraisal.

An appropriate Order will be entered.