Robert James **RICHARDS**, Appellant,

v.

Milton Stanley **MILESKI**, et al.
**(Two cases).**

**Nos. 79–2422, 80–1112.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1981.
Decided Aug. 21, 1981.

Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 79–1837).

Joseph Remcho, San Francisco, Cal., with whom James Drew and Robin B. Johansen, Washington, D. C., was on the brief, for appellant.

Robert C. Seldon, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell and John Oliver Birch, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.

Before WILKEY and MIKVA, Circuit Judges and GORDON,* Senior District Judge for the Western District of Kentucky.

Opinion for the Court filed by Circuit Judge MIKVA.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

MIKVA, Circuit Judge:

Robert J. Richards, the plaintiff-appellant, was a career employee with the United States Information Agency (USIA) until 1955, when he resigned under the duress of false charges of homosexual activity. Although Richards acknowledges that he has been aware of the falseness of the charges since 1955, he claims that it was not until 1978, some 23 years after the termination of his employment, that he became aware of knowingly false reports filed by investigators and his superiors that led to the charges and his subsequent forced resignation.

Less than one year after discovering the true nature of the government's behavior, Richards filed suit in the court below against six former federal officials, alleging a variety of tort injuries.[1] Defendants-appellees (defendants) moved to dismiss the complaint on the ground that the action was barred by the applicable statute of limitations. Their motion to dismiss was granted,[2] and this appeal followed. We recognize that the applicability of the statute of limitations is an affirmative defense, and under some circumstances its application is tolled. The tolling question in this case turns on controverted facts, none of which are appropriately decided on a motion to dismiss. Accordingly, we reverse and remand for further proceedings.

## I. THE BASIS OF THE LAWSUIT

As this matter is before us solely on Richards' complaint, without any responsive pleading from defendants, we accept the allegations of the complaint as true for purposes of this appeal.[3] From 1948 until August, 1954, Richards was a successful and well regarded career employee of USIA, which was then a part of the State Department. That month, defendant McNichol ordered that an investigation of Richards be conducted by defendants Mileski and Wilkie. Richards cooperated fully in the investigation and was given uniformly favorable comments by his co-workers, who were interviewed by defendants Wilkie and Fisher. In April, 1955, when the investigation had revealed no information not already contained in Richards' record and nothing of a derogatory nature about him, Mileski and Wilkie concocted a false declaration with the aid of an unreliable informant[4] alleging that Richards had engaged in homosexual activities.

One month later, Mileski and Wilkie questioned Richards and falsely told him that an informant had revealed Richards' homosexual practices. The interrogation lasted five hours, during which Mileski and Wilkie knowingly made false representations of USIA procedure and policy in an effort to coerce Richards to admit misconduct and resign. Following that lengthy interrogation, Mileski filed a report falsely stating that Richards had admitted misconduct during the interrogation. Mileski attached the informant's declaration to his report, and sent the documents to his superiors, including defendants McNichol and W.H.L. Sullivan, Chief of Special Investigations Branch.

1. Richards alleges the following wrongs: fraudulent misrepresentation, defamation of character, interference with economic advantage, intentional infliction of severe emotional distress, and violation of the constitutional rights to privacy, due process, and the privileges and immunities of citizenship. First Amended Complaint ¶¶ 1–59, Joint Appendix (J.A.) at 16–25.

2. The trial court granted defendants' motion to dismiss without oral argument on October 31, 1979. J.A. 71–74. On November 12, 1979, plaintiff moved for reconsideration and for leave to amend his complaint, and requested oral argument. Two weeks later, on November 30, plaintiff appealed from the October 31 order dismissing the case. By order dated January 8, 1980, the trial court denied the motions without opinion, and plaintiff filed notice of appeal from this second order on January 23, 1980. On March 7, 1980, this court on its own motion consolidated the appeals.

3. See, e. g., Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); Shear v. National Rifle Ass'n of America, 606 F.2d 1251, 1253 (D.C.Cir.1979).

4. Richards argues alternatively that the informant may never have existed at all.

In June, 1955, after being told that if he fought the charges of homosexuality his family (including his pregnant wife) would suffer considerably, Richards submitted his resignation. At the time he resigned, he was unaware that the agents who had forced his resignation had done so knowing the information on which they based their reports was false and that the informant was unreliable. Five days after Richards' resignation, Mileski wrote a second memorandum to Sullivan in which he explicitly stated that the informant was unpredictable and unreliable, and that his charges against Richards had no substance.

Richards alleges that for 23 years after that troubled resignation, he remained unaware of the memorandum and the other malicious conduct of the defendants. According to the complaint, although Richards obviously knew that the charges of homosexuality were false in 1955, he had to assume that the agents had been misled by an informer whom they had reason to believe. It was not until July 19, 1978, when Richards received a copy of the Mileski memorandum pursuant to a Freedom of Information Act (FOIA) request, that he became aware of the tortious conduct of the defendants. Richards acted with due diligence after obtaining the memorandum, and filed this lawsuit less than one year later, on July 13, 1979.

## II. THE STATUTE OF LIMITATIONS

■ The parties claim they agree on which statute of limitations applies, and that they differ only as to whether it should be tolled. In the interest of precision, we note that there are in fact two distinct limitation doctrines involved here. Some of the alleged torts arise solely under common law, and as such are subject to the limitation periods prescribed for such causes of action by District of Columbia law.[5] In addition to the common-law torts, Richards also states claims that come within the *Bivens* doctrine.[6] Because such a cause of action is federal in its origin, federal law provides the statute of limitations. In this instance, as no specific statute of limitations has ever been enacted by Congress for such claims, the appropriate local statute of limitations is borrowed.[7]

■ Determining which period of years governs Richards' claims will not resolve this case, however. The critical question is not whether the appropriate period is one year or three years, since Richards will qualify or fail under either standard. The key question is when and whether the statute is tolled; here too we must be sensitive to the boundaries of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Although local statutes of limitation are used for federal causes of action for which Congress has not provided an express limitation period, the tolling policy for such a case remains a federal question. See *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C.Cir.1977). Conversely, as to the common-law tort claims, the tolling question must be resolved under District of Columbia precedents. *Nyhus v. Travel Management Corp.*, 466 F.2d 440, 443 n.11 (D.C. Cir.1972). The possible confusion on this point is minimized, however, because the two tolling doctrines are substantially the same and can be applied with one brush to this case. We turn then to the reason why the case must be remanded.

## III. TOLLING THE STATUTE OF LIMITATIONS

■ Richards' basic harm occurred in June, 1955, when his career at USIA ab-

5. The District of Columbia prescribes a one-year statute of limitations for Richards' defamation action, D.C.Code § 12–301(4) (1973), and a three-year limitation for the other local law claims, D.C.Code § 12–301(8) (1973).

6. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), has supplied the doctrinal name of the line of cases that recognize a federal cause of action for damages directly under the Constitution in situations where federal agents violate constitutional guarantees under color of their authority.

7. The appropriate local statute for purposes of Richards' federal claims is the three-year limitation of D.C.Code § 12–301(8) (1973). See *Fitzgerald v. Seamans*, 553 F.2d 220, 223 (D.C. Cir.1979).

ruptly terminated. All of the defendants' conduct took place during the period around that date. Thus, without some counterpoise, the time for measuring the period of limitations commenced at the latest in June, 1955. The counterpoise is of course the concept of "tolling," which applies among other occasions when a defendant fraudulently conceals the facts giving rise to the plaintiff's claim. The statutes are tolled until the plaintiff, employing due diligence, could have discovered the facts that were fraudulently concealed. Applying this doctrine to the case before us, we conclude that the statute of limitations may well have been tolled until July 19, 1978.

The gravamen of this lawsuit is not the falseness of the homosexuality charges against Richards, or the government's impropriety in coercing him to resign. Richards obviously knew both of these "facts" in 1955; if the lawsuit were premised on these concerns, any statute of limitations would have run long ago. Rather, the tortious conduct about which Richards complains is the defendants' *knowing* and malicious use of false information to obtain Richards' resignation under duress. On the basis of the allegations that were before the trial court, it is not clear as a matter of law that the statute of limitations has run: Richards says he did not know of that conduct because it was fraudulently concealed from him until he received the FOIA documents on July 19, 1978. Richards' assertion is sufficient to bring the doctrine of tolling

into play both for his federal and common-law claims.

The defendants claim the statutes were not tolled because Richards knew in 1955 that the charges against him had been fabricated. This gave him a fully ripe cause of action against the federal government, defendants argue, and thus Richards' failure to press those claims at the time precludes tolling, which is inappropriate where the plaintiff simply fails to discover all the "details" of a fraud.[8] This analysis is untenable. There are obvious differences between the claims against the government that Richards may have waived by his inaction in 1955 and those he now seeks to bring against individual defendants. It was no mere "detail" in 1955 that the false charges against Richards had been fabricated as part of a deliberate conspiracy against him, or that his own superiors rather than an unknown informant were the source of his misery. Possible claims of wrongful discharge or coerced resignation, which are not raised in this suit, are entirely separate from the causes of action for which Richards now seeks his day in court.[9]

Our conclusion about Richards' claims is controlled by *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C.Cir.1977), in which this court reversed the dismissal of tort claims in a case that is essentially on all fours with this one. We held there that even though Fitzgerald had reason to believe that he was being eased out of his job

8. Defendants rely in particular on *Winkelman v. Blyth & Co., Inc.*, 518 F.2d 530 (9th Cir.), *cert. denied*, 423 U.S. 929, 96 S.Ct. 278, 46 L.Ed.2d 257 (1975), and *Kern v. Hettinger*, 303 F.2d 333 (2d Cir. 1962), for the proposition that a statute of limitations runs from the time the plaintiff discovers the falsity of the actionable misrepresentations, whether or not the plaintiff knows the identity of the author of those misrepresentations. Neither of these cases conflicts with our holding. These interpretations of the tolling doctrines of Oregon and New York, respectively, fail to support the broad reading urged by defendants. In *Winkelman*, the plaintiff is barred from asserting an untimely claim against a stockbroker because it was held that he should have had notice of the broker's misrepresentations as to the worth of the stock long before he discovered the broker's financial interest in that stock. In *Kern*,

the plaintiff knew he had been defamed, actually brought several timely libel actions, and was barred from making a late claim against a bank whose identity he could easily have discovered before the statute had run. In the instant case, however, governmental secrecy not only kept Richards ignorant of the identity of the people who had defamed him, but even of the fact that he was the victim of a wrong at his employers' hands at all.

9. These differences seem even more obvious when it is hypothesized that Richards might assert every one of his current claims, save that of defamation, against these individuals, even if the government had indeed had some factual basis other than the informant's false declaration for demanding his resignation in 1955.

in the Air Force in retaliation for his testimony before Congress, he had no reason to know of the involvement of a White House official in that conspiracy until after the statute of limitations had run. Because the government had concealed defendant Butterfield's involvement, the statute was tolled until such time as a duly diligent Fitzgerald discovered or should have discovered Butterfield's involvement.

It is true that *Fitzgerald* affirmed the dismissal of the plaintiff's action against Air Force officials because he had known for more than three years of facts "pointing toward retaliation" by these officials and thus had no right to delay in bringing suit. 553 F.2d at 229. The court below viewed this aspect of *Fitzgerald* as controlling in the instant case:

> In *Fitzgerald*, the plaintiff, a cost analyst with the Department of Defense, was held to have been put on notice of the conspiracy against him among Air Force officials by virtue of obvious changes in his working environment.... Here, plaintiff was also aware that he had never engaged in homosexual activity, but that nonetheless he was suffering harassment at the USIA as a result of charges concerning such activity. Although plaintiff must have known that he was being falsely accused, he failed to pursue his legal rights.

Order Granting Defendants' Motion to Dismiss, October 31, 1979, Joint Appendix (J.A.) at 73. But this overlooks the distinction drawn in *Fitzgerald* between the Air Force officials, against whom Fitzgerald's claims were barred, and Butterfield, the White House official whose involvement Fitzgerald had had no reason to suspect. Fitzgerald had made related allegations against the Air Force officials in a civil service proceeding some years earlier, and thus obviously had reason to know or suspect their involvement at that earlier date. By contrast, Richards made no such charges against these defendants in 1955. Nothing Richards did or observed—on this record—suggests that he had knowledge of defendants' actions prior to receipt of the Mileski memorandum. Indeed, Richards' case for

tolling is even stronger than Fitzgerald's, because Richards was unaware of any conspiracy at all. He had no reason, according to the complaint, to suspect anybody other than the informant of any tortious conduct. That conduct was concealed by the false statements and reports of the defendants. They concealed not only their involvement, but the very conduct itself.

Although District of Columbia tolling precedents apply slightly different reasoning, they require the same outcome in this case. Under the law of the District of Columbia, fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any word or act tending to suppress the truth is enough. *See, e. g., William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1191–92 (D.C.App. 1980). In addition, the local statutes of limitation are tolled in cases involving misrepresentation, even if that misrepresentation does not hide the cause of action itself, until such time as the misrepresentation should have been discovered. *See, e. g., Keener v. Walker*, 256 A.2d 779, 781 (D.C. App.1969). Richards' case satisfies both of these related grounds for tolling the statutes. Defendants affirmatively suppressed the truth in 1955 by misrepresenting to Richards that they had testimony they considered reliable indicating that he was a homosexual, when in fact they had no such evidence. Their affirmative acts prevented Richards from realizing·that he had a cause of action against them. Moreover, because the defendants misrepresented their belief in the reliability of the alleged informer, the statute was tolled until Richards should have discovered their misrepresentation, whether or not that misrepresentation concealed the underlying cause of action. Under either or both of these tolling doctrines, plaintiff's common law tort claims could have survived beyond 1978.

## IV. DUE DILIGENCE

Under both federal and District of Columbia tolling doctrines, Richards' cause

of action is not barred by the statutes of limitation unless the facts show that the plaintiff failed to exercise due diligence in discovering the material facts underlying his cause of action. The current posture of this case makes it impossible to charge Richards with an absence of due diligence. When tolling is proper because the defendants have concealed the very cause of action, or their involvement in a cause of action about which the plaintiff might otherwise be aware, they have the burden of coming forward with any facts showing that the plaintiff could have discovered their involvement or the cause of action if he had exercised due diligence. *See Smith v. Nixon,* 606 F.2d 1183, 1191 (D.C.Cir.1979). Defendants have failed to present any facts showing that Richards could have discovered earlier their knowing use of false charges against him. On the facts before us, there is absolutely no basis on which to hold that Richards should have discovered the defendants' culpability before 1978.

■ Richards, in an attempt to explode this issue before the defendants can properly begin to raise it, urges that 1978 was the earliest date by which he could have obtained the Mileski memorandum and that the diligence of his quest for a remedy should be measured from that date.[10] We agree with his conclusion but not his reasoning. It is irrelevant, in this case, when FOIA would have entitled Richards to obtain the memorandum in question. The test of due diligence measures the plaintiff's efforts to uncover his cause of action against what a reasonable person would have done in his situation given the same information.

Richards did not know the identity of the alleged informer. He expected his 1978 FOIA request to be fruitless, but went ahead anyway. The discovery of the Mileski memorandum was entirely fortuitous. Moreover, and perhaps most importantly, the defendants have not shown any circumstances that should have given Richards special reason to make a FOIA request prior to 1977. In short, on the facts of this case, there was no affirmative duty on Richards to have sought documents under FOIA earlier than he did, and it is utterly irrelevant whether FOIA was available to him in 1966 or 1974 or any other time. It cannot be said as a matter of law that Richards failed to use due diligence in not filing his FOIA request until 1978, for he had no reason to suspect that such a request would reveal the startling possibility that the officials with whom he had worked had conspired against him.

This conclusion is demanded by reasons of economy as well as common fairness. A federal employee need not presume that his superiors have engaged in a conspiracy to force him wrongfully and maliciously from his job. "Though the law of fraud does not endorse a hear no evil, see no evil approach, neither does it require that an aggrieved party have proceeded from the outset as if he were dealing with thieves." *Hudak v. Economic Research Analysts,* 499 F.2d 996, 1002 (5th Cir. 1974). Any other rule would impel all dismissed federal employees to file unnecessary and otherwise pointless FOIA requests solely to preserve any potential claims that would otherwise lapse.[11] *See*

---

10. FOIA was first enacted in 1966. Act of July 4, 1966, Pub.L.No.89–487, 80 Stat. 250. Richards argues that the information he received in his 1977 request was exempt under FOIA until the statute was amended on November 21, 1974. 5 U.S.C. § 552(b) (1980); *see* Project, *Government Information and the Rights of Citizens,* 73 Mich.L.Rev. 971, 1085–1181 (1975). We need not decide whether Richards' interpretation of FOIA is correct, because this argument would not provide an independent basis for tolling the statute through the end of 1977. Richards admits that he waited until November 24, 1977, to file his FOIA request, a delay of slightly more than three years. He argues that

he did not realize he had the right to use the amended FOIA until shortly before he filed the request, but mere ignorance of the law does not ordinarily toll the statute of limitations. As we explain in the text, it appears that Richards did exercise due diligence because even at the time he filed his FOIA request he had no knowledge of facts that would put him on notice that defendants had deliberately used false information to harm him.

11. Our conclusion is buttressed by an appreciation of the practical difficulties that would attend requiring potential plaintiffs to exhaust their FOIA opportunities within the statute of limitations period. Richards filed his first

*Fitzgerald v. Seamans,* 553 F.2d at 228 (tolling doctrine "tends to obviate the danger that dismissed government employees will rush to litigation on bare suspicion that superiors acted in bad faith and outside the perimeter of their duties.") In *Smith v. Nixon,* 606 F.2d 1183 (D.C.Cir.1979), this court held that a genuine issue of material fact remained as to whether government secrecy had foreclosed a journalist from learning of a wiretap before it became public knowledge. "We cannot impose an obligation on all citizens to initiate a triennial request of the Government as to whether they are under official surveillance." *Id.* at 1191. Some additional facts must be adduced before it can be said that Richards delayed unreasonably in filing his FOIA requests.

That additional evidence does not lie in the fact that Richards knew the falseness of the charges against him, or objected to the harsh way his superiors treated him. It is irrelevant that Richards requested a lawyer during the Mileski · interrogation and that his request was refused, or that he "had full knowledge of the identities of the employees of the government involved in pressuring him to resign." Brief for Appellees at 10. It does not help defendants merely to point to Richards' allegation that he knew in 1955 "that any concessions he had made to Mileski and Wilkie had been made under duress and misrepresentation and were untrue." First Amended Complaint ¶ 24, J.A. 20–21. Of course Richards knew that the charges against him were based on misrepresentation and that he was being pressured into resigning. This says nothing

about whether he should have sensed his employers' alleged involvement in a reprehensible practice. Had Richards' employers genuinely believed in the credibility of their informant, their efforts to coerce him into resigning would not have been considered tortious, given the tenor of the time.[12] Nothing in the facts before us demonstrates how Richards could have been put on notice before 1978 that the defendants deliberately conspired to ruin the career of an innocent man. Unless subsequent proceedings develop a credible record that Richards knew or should have known of the defendants' tortious conduct prior to July 19, 1978, it is both plausible and proper for Richards to assert that he thought he had been the victim only of a false informant against whom no redress was possible. Richards not only did not know who else had wronged him, he did not know that he did not know who else had wronged him.

We are conscious of the strong policies in favor of statutes of limitation, of the interest of defendants in being free of claims after a reasonable period of time in which no action is brought, and of the practical difficulties inherent in any judicial attempt to reconstruct the truth, especially the facts of a situation that existed 26 years ago. Our discomfit is not a valid reason, however, for rearranging the statutory limits on Richards' cause of action by refusing to employ the doctrine of tolling in a case where it clearly applies. The statutes of limitation governing Richards' claims against these defendants may well have been tolled until July 19, 1978, and nothing in the current record shows that Richards

FOIA request on November 24, 1977, but did not receive the critical Mileski memorandum until after "considerable effort," on July 19, 1978. He alleges that government officials delayed nearly a year in furnishing the requested information, and attempted to delete or falsify key parts of the information sought. First Amended Complaint ¶ 34, J.A. 109. Moreover, Richards did not even realize the existence of the Mileski memorandum until after the earlier production of other USIA documents led plaintiff's counsel to suspect its existence, illustrating that several FOIA requests may be necessary before a plaintiff finds inducement to bring a lawsuit.

12. For example, Richards argues that the era was one of "witch-hunts" and "blacklisting," when due process of law gave way to guilt by implication, and when "homosexual" was used synonymously with "psychopath" and "security risk." In the hysteria of the times, Richards argues, ·"it was entirely normal for government officials to over-react to charges of homosexuality," and thus plaintiff's harsh treatment at the hands of his superiors could hardly be considered evidence of their wrongdoing. Brief for Appellant at 18–20.

failed to use due diligence to discover the underlying facts prior to that date.

## V. APPROPRIATENESS OF THE MOTION TO DISMISS

As a final point, we make one observation about the procedural history of this lawsuit. There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense. Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense. The filing of an answer, raising the statute of limitations, allows both parties to make a record adequate to measure the applicability of such a defense, to the benefit of both the trial court and any reviewing tribunal. We do not hold that the use of a motion to dismiss is always improper to raise a statute of limitations defense, but we do suggest that a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense.[13] On remand, and upon filing an appropriate responsive pleading, the appellees will be free to present whatever evidence they have of Richards' dilatory behavior, if any. In the current posture of the case, however, it was error to dismiss the action on the basis of an affirmative defense without any responsive pleading from the defendants.

Because we believe that Richards' complaint stated allegations of fraud and due diligence more than sufficient to invoke the tolling doctrine and survive a motion to dismiss on statute of limitations grounds, we need not reach appellant's claim that the trial court erred in granting defendants' motion to dismiss without leave to amend.[14]

*Reversed and remanded.*

---

**13.** We do no more than add to an overwhelming line of authority. *See, e. g., Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 235, 79 S.Ct. 760, 763, 3 L.Ed.2d 770 (1959) (question of plaintiff's diligence "cannot be decided at this stage of the proceedings," on a motion to dismiss); *Jones v. Rogers Memorial Hospital*, 442 F.2d 773, 775 (D.C.Cir.1971) (statute of limitations defense cannot be decided on a motion to dismiss "unless it appears beyond doubt" that plaintiff can prove no facts to entitle him to relief); *Houlihan v. Anderson-Stokes, Inc.*, 434 F.Supp. 1319, 1324 (D.D.C. 1977) (issue of due diligence requires a finding of fact and thus is not suitable for determination on motion for judgment on the pleadings).

**14.** It is well settled that the policy of the federal rules of civil procedure is to decide cases on the basis of substantive rights rather than technicalities, and this requires that plaintiffs receive every reasonable opportunity to cure formal defects in their pleadings. *See, e. g., Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012 (D.C.Cir.1981); *Shapiro v. Secretary of State, 499 F.2d 527, 534 (D.C. Cir.1974)*, aff'd on other grounds sub nom. Commissioner of Internal Revenue v. Shapiro, *424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976)*.