Paris MORTON (No. 97–CV–817), Patricia Walker (No. 97–CV–818), Kathryn James (No. 97–CV–819), Russell Cappello (No. 97–CV–855), and Bernard Freed (No. 97–CV–872), Appellants,

v.

NATIONAL MEDICAL ENTERPRISES, INC., n/k/a Tenet Healthcare Corp., et al., Appellees.

Nos. 97–CV–817, 97–CV–818, 97–CV–819, 97–CV–855, 97–CV–872.

District of Columbia Court of Appeals.

Argued April 22, 1998.
Decided Feb. 11, 1999.

---

Kenneth D. Pack, with whom E. David Hoskins, William G. Minkin, Baltimore, MD, and John Jude O'Donnell Washington, DC, were on the brief, for appellants.

F. Joseph Warin, with whom Julia A. Dahlberg and Thomas G. Hungar, Washington, DC, were on the brief, for appellee Psychiatric Institutes of America, Inc.; Paul D. Krause and Carol Ann Petren, Washington, DC, for appellee Psychiatric Institute of Washington, D.C., Inc.; Lawrence K. Gustafson, Washington, DC, for appellee National Medical Enterprises, Inc.; Steven A. Hamilton and John J. Dillon, Washington, DC, for appellee Gary R. Spivack, M.D.; Andrew E. Vernick and Michael K. Wiggins, Annapolis, MD, for appellees Richard Greenberg, M.D., Shirley Papilsky, M.D., and Jean Smith, M.D.; Thomas V. Monahan, Winchester, VA, and Susan T. Preston, Baltimore, MD, for appellees Alan J. Salerian, M.D., Lawrence A. Brain, M.D., Joseph Marnell, M.D., and Metropolitan Psychiatric Group.

Before SCHWELB and RUIZ, Associate Judges, and KING, Senior Judge.[*]

KING, Senior Judge:

In this consolidated appeal, appellants challenge the trial court's award of summary judgment to appellees on statute of limitations grounds. The litigation arose out of the allegedly negligent treatment appellants received at psychiatric hospitals affiliated with or subsidiary to National Medical Enterprises, Inc. (NME), between 1986 and 1991. Appellants' suits, which were filed in Superior Court on May 1, 1996, therefore are barred by the three-year statute of limitations for medical malpractice, D.C.Code § 12–301 (1995 Repl.), unless appellants have a separate cause of action for fraud that accrued on or after May 1, 1993. Concluding that appellants do not have a cause of action based on NME's fraudulent nationwide conspiracy that is independent of their medical malpractice claims and that the trial court properly granted summary judgment on statute of limitations grounds, we affirm.

## I. FACTS

On June 29, 1994, in the United States District Court for the District of Columbia, as a result of criminal investigations conducted by the United States Attorney, Psychiatric Institutes of America (PIA)[1] pleaded guilty to a limited information and agreed to a fine of $379 million in exchange for a promise by the government not to prosecute NME. Appellants here allege that the criminal investigation uncovered a nationwide fraudulent conspiracy to extract maximum

---

[*] *Judge* KING was an *Associate Judge* of this court at the time of argument. His status changed to *Senior Judge* on November 23, 1998.

1. PIA is a subsidiary of NME.

insurance benefits from patients without regard for treatment needs.

According to the allegations set forth in the complaint, NME devised and engaged in a nationwide scheme which systematically and fraudulently induced individuals to be admitted to psychiatric hospitals where such admissions were not necessary.[2] As part of that scheme, NME promoted a corporate culture in which doctors and other hospital staff were rewarded for converting potential patients into actual patients without regard to those individuals' treatment needs.[3] Similarly, a network of outside health care providers in the community,[4] were rewarded for guiding patients to NME facilities, again without regard for actual treatment needs. All hospital staff members, as well as outside referral sources, were required to participate in NME's marketing plan, whose sole purpose was to generate claims against patients' health insurers.

The complaint also alleges that potential patients receiving an initial psychiatric evaluation, as well as those calling an NME facility, were immediately requested to give insurance coverage information. Patients with insurance were almost invariably admitted, assuming they consented, without regard for treatment needs. In addition, NME staff researched the terms of the patients' insurance coverage and generated a diagnosis matching the category with the most available benefits.[5] NME staff were often instructed to chart the diagnosis and to omit any notations that might indicate that a patient's hospitalization was unnecessary or inappropriate. NME then submitted the reimbursement claims, which contained knowingly false representations that the admission was medically necessary and appropriate, to the patient's insurer.

It was also contended that, once admitted, patients were typically kept for the maximum length of stay their insurance would cover, which was often twenty-eight days, regardless of their illness. Staff were ordered to keep patients in NME facilities over holidays and weekends to maximize benefits. If a patient asked to leave an NME facility before the expiration of insurance coverage, an AMA (Against Medical Advice) team made up of medical professionals was assigned to persuade that patient to stay until coverage ended.

After the negotiated plea bargain agreement was entered, more than 200 civil actions were filed in the Superior Court beginning in March 1995, on behalf of former patients, and in some cases their parents, against NME-owned psychiatric hospitals in the District of Columbia, Maryland, and Virginia.[6] A group of twenty of these plaintiffs, whose claims were facially barred by the three-year statute of limitations for medical malpractice suits, agreed to limited discovery with respect to the statute of limitations issue only and subsequently responded to defendants'

2. The scheme was operated and managed through a large scale data and tracking system connecting individual hospitals' computer systems to NME headquarters in Washington, D.C. The system generated reports comparing each patient's projected discharge date with remaining insurance benefits and ordered corrective action if a patient was scheduled to be discharged *before* benefits had been exhausted. These reports also enabled NME to monitor, on a daily basis, the "performance" of doctors and administrators at NME hospitals in their compliance with the NME plan to use patient insurance benefits to the maximum extent possible and to not admit patients without coverage. Referral agreements with doctors were renewed on the basis of performance as reflected in such reports.

3. Doctors were rewarded with "practice guaranties," payments disguised as loans which would later be forgiven, for admitting high numbers of patients to NME hospitals and for "justifying" keeping patients longer than necessary.

4. These providers included independent contractor physicians, who also performed inpatient psychiatric services after admittance; independent referral agencies; school counselors; psychologists; probation and parole officers; emergency room nurses; alcohol abuse counselors; and employee assistance personnel.

5. Thus, the diagnosis and recorded symptoms might be switched from drug or alcohol abuse to a psychiatric diagnosis such as depression, which generally provided more insurance coverage.

6. In *Eric. T. v. National Medical Enterprises,* 700 A.2d 749 (D.C.1997), this court affirmed the trial court's order dismissing the complaint of 145 plaintiffs on *forum non conveniens* grounds.

interrogatories on that issue.[7] The responses of eleven of the plaintiffs in this group indicated some awareness of the facts underlying defendants' alleged misconduct, and of injuries resulting from that alleged misconduct, prior to May 1, 1993.[8] On the basis of the responses of these eleven plaintiffs to the interrogatories, the defendants moved for summary judgment, which the trial court granted on April 2, 1997.

In granting the defendants' motion for summary judgment on statute of limitations grounds, the trial judge rejected the plaintiffs' argument that they had reasonably relied on defendants' assurances that their hospitalizations were appropriate, concluding that "such reliances were unreasonable" given "the extreme nature of [the] allegations." The trial judge also rejected plaintiffs' contention that they could not be charged with knowledge of their cause of action for fraud prior to February 1, 1995, when their counsel informed them of defendants' involvement in a " 'nationwide fraudulent conspiracy,' " concluding that all of their causes of action accrued at the time when they learned or should have learned of their medical malpractice claims. Judge Graae explained:

> This court sees the medical malpractice claims as the central allegation in these cases. Generally, without a finding of medical malpractice, Plaintiffs do not have a claim for fraud, conspiracy and other related causes of action. Therefore, since

the statute of limitations has run as to Plaintiffs medical malpractice claims, Defendants' motion should be granted.

Appellants in this case are five of those eleven plaintiffs whose suits were found to be barred by the statute of limitations by Judge Graae. All five are former patients of the Psychiatric Institute of Washington (PIW), a subsidiary of PIA. In their responses to appellees' interrogatories, each states that he or she suspected, at or around the time of their hospitalizations, that the treatment received at PIW was inappropriate, inadequate, and abusive, and that it caused them injury.

Bernard Freed, who was referred to PIW for anxiety,[9] claims he was not seen by his treating physician until five or six days after admission; his brother, a physician, told him he should have been seen within twenty-four hours.[10] Although "he expected a retreat atmosphere to relieve his anxiety ... he was placed with patients experiencing psychosis, alcoholism, [and] drug withdrawal, all of which heightened his anxiety."[11] Freed claims that he never received individual therapy sessions and that the group sessions, involving only about twenty minutes of "therapy," were dominated by "psychotic patients who [would] ramble incoherently, or scream or yell," and were a "sham." Freed suffered severe withdrawal symptoms during his first three days at PIW,[12] after his medication was taken from him upon admittance. Intending to switch him to a new medication, PIW staff

7. By order of April 17, 1996, Judge Steffen W. Graae severed these twenty cases from the other consolidated cases for the purpose of limited discovery on the statute of limitations issue, ruling that

> the[se] individual cases ..., once severed, will proceed in two phases. In the first phase, commencing May 1, 1996, the parties will engage in discovery related to statute of limitations .... At the conclusion of the first phase, Defendants may file dispositive Motions on the statute of limitations issue. Should any of these cases survive dispositive Motions on the statute of limitations issue, they will require discovery on the merits.

8. Because the suits were filed on May 1, 1996, any claims accruing on or before May 1, 1993, are outside the three-year statute of limitations.

9. He was referred by a doctor who had been treating him on an outpatient basis. The doctor,

who had "an arrangement" with the PIW doctor who became his treating physician, told him "how great [the PIW doctor] and PIW were, ... and how 'some patients don't want to come home they are so happy at PIW.' '

10. Moreover, he states that he was not given his "admission physical" until the day he checked himself out of PIW.

11. Freed states that placing a patient "suffering [as he was] from extreme anxiety with actively psychotic, hallucinatory, and delusional patients who barked like dogs, accused [him] of bugging their room, [and] were in severe drug and alcohol withdrawal ... was 'like throwing gasoline on a fire.' "

12. He claims that he began to have heart attack-like symptoms and was awake for three days and nights as a result of PIW's failure to manage his switch to a new medication.

allegedly failed to manage the switchover properly and neglected to provide Freed with any support for his severe withdrawal symptoms or information concerning the switchover.

Russell Cappello alleges that PIW failed to do even a rudimentary screening of roommates and that, as a result, he was improperly placed "in a room with a homosexual/bisexual roommate" who "attempte[d] to force Cappello to have oral sex," which "greatly traumatized him." He claims the hospital failed to provide appropriate treatment, including family therapy and counseling. Cappello also alleges that "medication was withheld from him until the day before discharge, allowing [him] to linger in psychic pain and to suffer . . . unnecessarily."

Paris Morton was taken to PIW by his mother due to displays of uncontrollable anger. According to Morton,[13] despite the fact that he had never used drugs and despite his subsequent complaints, he, too, was improperly "housed with addicts and others with drug and alcohol problems." Further, PIW staff "never discussed his anger and how to control it." PIW "failed to send [Morton] to an appropriate program for the developmentally disabled," or, instead, to provide appropriate outpatient and family therapy. Morton further claims that "[t]here was a lack of medical attention, a lack of substantial therapies, and a complete inattention to Paris' borderline intellectual abilities (IQ of 70)." Morton alleges he was overmedicated and given the wrong medication for his condition. According to his mother, he "acted 'like a zombe' [sic] and had slurred speech." Despite his mother's requests for outpatient therapy, he was admitted for a second stay as an inpatient. Finally, Morton suffered physical abuse; he was struck in the face by a PIW nurse and restrained in a dark closet for a long period. His mother repeatedly complained to PIW doctors and staff concerning his treatment; she was assured that her fears were unfounded.

Patricia Walker claims that she was never treated for her alleged sexual abuse; instead, she was labeled a "borderline personality, . . . a severe and pervasive personality disorder," and was "humiliated" by being so labeled. Walker further states that her "self-esteem was damaged and her self-confidence shattered by being physically assaulted and thrown to the floor" by PIW staff, and "humiliated" by her "subsequent confinement to her room for several days . . . [and by] being denied the proper hygiene and grooming products." Further, "[t]he terror of the incarceration and control by others" made her "worse not better from this hospitalization."

All five appellants also indicate that they or close family members noted the excessive focus of PIW's medical practitioners and administrators on extending their hospitalizations for as long, and then only as long, as their insurance coverage lasted, and a corresponding lack of concern for appropriate or compassionate treatment. In addition, a number of appellants describe PIW's extreme and coercive efforts to prevent them from leaving the hospital before their benefits were exhausted.

Kathryn James "came to suspect the wrongful conduct of" her doctor when she was required to stay beyond the agreed-upon period despite her requests to be discharged and her belief that she did not require inpatient treatment. When her insurance did run out, she was discharged "abrupt[ly], without preparation," even though her condition was then "highly fragile, [as she had just] revealed episodes of physical, emotional and sexual abuse from childhood," and despite informing PIW "that she felt she was in worse condition than when she was admitted." She states she was told that "the reason for her discharge was that her insurance had run out."

During one of her four hospitalizations, James came to believe she did not need inpatient treatment. Whenever she sought to leave the hospital, she claims, "she was coerced by a 'SWAT team' consisting of nursing personnel and [her doctor], who would badger her constantly . . . and threaten her into staying longer." Her doctor allegedly

---

**13.** Paris Morton, as well as his mother, participated in answering these interrogatories, along with Morton's attorneys.

told her he would have her committed if she tried to leave. She even consulted an attorney about her right to leave the hospital [14] and, after formally discharging herself despite her doctor's disapproval, was "so terrorized and afraid" of PIW staff that she enlisted the police to escort her to PIW to collect her belongings.

Similarly, Paris Morton was "immediately discharged, exactly thirty days from his admission," after his mother received a call from PIW telling her that Morton's insurance would no longer pay his entire bill and his mother informed PIW that she could not afford the co-payment. Morton's mother did not believe the discharge was "medically appropriate." According to Morton's mother, the staff had initially assured her that a payment plan could be arranged if payment were a problem; however, upon expiration of those thirty days, the same staff "made it clear you must leave due to lack of insurance."

Patricia Walker's mother initially brought her to PIW simply to speak with a doctor concerning her depression. Instead, according to Walker, she was admitted to PIW and her mother was told she wouldn't be able to see her daughter for a week. Walker was prevented from speaking with her mother for four days and then only for short periods. Walker's mother repeatedly sought her daughter's release; she was allegedly told by one doctor "that Patricia would not be released until every insurance day was used up." Walker's friends and family told her that she should not have been admitted for inpatient treatment, and Walker herself did not believe her problems required inpatient

treatment.[15] She was released on exactly the day her insurance ran out.[16]

Russell Cappello's parents, concerned that their son was being mistreated at PIW, attended a parents' conference a week into his hospitalization. Allegedly, the main topic of the conference was health insurance, specifically the length of stay his insurance would cover, rather than Capello's treatment. Cappello's parents had him released the next day, despite the disapproval of his physician.[17]

Appellants' complaints contain nine identical counts: conspiracy to commit fraud, fraudulent misrepresentation, negligence, violation of the D.C. Consumer Protection Act, intentional infliction of emotional distress, negligent misrepresentation, breach of fiduciary duty, breach of contract, and restitution. Individual appellants also allege a number of additional counts in their complaints.

## II. DISCUSSION

Appellants contend that "[a]t its heart, this case is about a conspiracy to defraud patients at NME's psychiatric hospitals, which (because treatment was either entirely unnecessary, improperly prolonged, or prematurely terminated) also resulted in acts of medical negligence." The issue before us is whether all of appellants' claims stem from medical malpractice, which occurred long beyond the three-year limit on the filing of such claims, or whether they have independent fraud-based causes of action premised on the nationwide criminal scheme, in which case a question of fact exists as to whether those causes of action arose before the expiration of the three-year statute of limitations.[18] We

14. The attorney allegedly told her she had the right to leave after about nine days.

15. A doctor Walker consulted following her hospitalization also "indicated to [her] parents that [her] admission was questionable."

16. Walker claims that following her discharge, her "insurance company reviewed her records and refused to pay on the basis that [she] was not ill enough to be hospitalized." According to Walker, she was then unable to attend college due to the "dire financial circumstances that her parents found themselves in," as a result of the hospitalization.

17. Cappello further alleges that the same doctor who disapproved his release retaliated against him by later sending a letter to his school stating that Capello was "schizophrenic and suicidal," although Capello had never been so diagnosed. This "mean-spirited" letter allegedly prevented his return to his high school and forced him to enroll in a school for emotionally disturbed students, which stigmatized him and hindered his educational progress.

18. The statute of limitations for fraud is three years. D.C.Code § 12–301(8) (1995) (catch-all provision). Assuming an independent fraud-based claim exists, the question of fact relating to

conclude that all of appellants' claims accrued around the time of their hospitalizations, and therefore their suits were not timely filed.

### A. Negligence Claims Accrued Around Time of Hospitalization

"Generally, a cause of action is said to accrue at the time injury occurs." *Bussineau v. President & Dirs. of Georgetown College*, 518 A.2d 423, 425 (D.C.1986) (citing *Shehyn v. District of Columbia*, 392 A.2d 1008, 1013 (D.C.1978); *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 994 (D.C. 1978)). "However, in cases where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs, we apply a 'discovery rule' to determine when the statute of limitations commences." *Id.* (citations omitted). "[F]or a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of *some evidence* of wrongdoing." *Id.* at 435 (emphasis added).

"The discovery rule does not, however permit a plaintiff who has information regarding a defendant's negligence, and who knows that she has been significantly injured, to defer institution of suit and wait and see whether additional injuries come to light." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C.1994)(en banc). *Accord, Hendel v. World Plan Executive Council*, 705 A.2d 656, 661 (D.C.1997) ("The discovery rule does not, however, give the plaintiff *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm."). Thus, a cause of action will accrue once a plaintiff has knowledge of "some injury," its cause in fact, and "some evidence of wrongdoing." *Colbert, supra*, 641 A.2d at 473. The record in this case clearly indicates that, at the time of their hospitalizations or soon thereafter, all five appellants were aware: (1) of their injuries; (2) that PIW was the cause in fact; and (3) of some evidence of wrongdoing on the part of PIW. We agree with the trial court which found that plaintiffs' "notice of their

the fraud-based claims concerns when appellants

malpractice claims [w]as evidenced by [their] questioning [appellees' alleged] misconduct as it occurred." A number of factors lead us to that conclusion.

For example, Bernard Freed's complaint alleges that the treatment of PIW staff constituted "mental and physical abuse;" that he "suffered great physical pain" and "terror" at PIW due to the improperly handled medication switchover; and that he was "subjected to ... degradation and humiliation" at PIW. He states that the therapy provided by his treating physician "was of no value, and actually worsened [his] condition" and that he "suspected that [his doctor's] conduct was questionable while he was at PIW." Freed also states that he "became aware of his condition after being released from PIW," when he was "anxious, depressed, could not eat and lost significant weight." Following his release, he has lived "in terror that he would have to wind up in a hospital similar to PIW;" "driving past the former PIW hospital [i]nduces a state of anxiety and depression" in him. The other four appellants make similar claims in their complaints. Therefore, because appellants were aware that they had been injured and that appellees were the cause in fact, and because appellants had some evidence of wrongdoing, their medical malpractice claims accrued at that time. *Bussineau, supra*, 518 A.2d at 435.

Appellants argue, however, that even their negligence claims may not have accrued around the time of their hospitalizations because appellants were not and could not then be aware of the full extent of the claims:

Unlike the more usual negligence or malpractice claims, these cases involve multiple wrongs and injuries tied together by the common thread of the fraudulent conspiracy.... In the instant case, the allegations are unusual in that there are, in effect, multiple independent components within a specific cause of action....

[W]ithout the knowledge of the full scope of the conspiracy which provides essential evidence of and context for the disparate acts and omissions which make up the negligence, it might not be possible

learned of the alleged nationwide conspiracy.

to prove any given act was negligent rather than the unsuccessful application of professional judgment . . . . The pattern and practice is essential to the fraud in cases such as these, and only becomes evident when numerous cases are viewed in the aggregate.

We reject this line of reasoning because, in this jurisdiction, the discovery rule requires only that a plaintiff have *some evidence* of both the injury, *Colbert, supra,* 641 A.2d at 473, and the defendant's wrongdoing, *Bussineau, supra,* 518 A.2d at 435, as well as knowledge of the cause in fact, *id.,* for a negligence claim to accrue.[19]

In *Bussineau,* this court explicitly adopted the requirement that a plaintiff have "*some* evidence of wrongdoing" for a medical malpractice claim to accrue. *Id.* (emphasis added). We stated that "the statute should not commence until a claimant knows, or through the exercise of due diligence, should know, that his injury resulted from someone's wrongdoing." *Id.* at 430. At the same time, we declined to adopt the rule of some jurisdictions that "a medical malpractice cause of action does not accrue until a claimant has had a reasonable opportunity to discover *all* of the essential elements of a possible cause of action." *Id.* at 433.[20] Applying these standards, we are satisfied that appellants' cause of action began to run around the time of their hospitalizations, because it was then that they, concededly, acquired *some evidence* of appellees' wrongdoing.

In *Colbert,* we held that a plaintiff need not be aware of the full extent of her injuries for her cause of action to accrue. In that case, we concluded that appellant's cause of action accrued in 1982 or 1983, after she learned that, due to her doctor's admitted negligence, her chances of survival from breast cancer had been reduced from ninety percent to ten percent, rather than in 1986, when she discovered that the cancer had indeed spread to her spine and hip. In addition to learning of her doctor's negligence in 1982, the appellant received injuries during 1982 and 1983 as a result of that negligence, including the debilitating effects of an aggressive treatment of chemotherapy and radiation, as well as removal of her non-cancerous breast.

We rejected appellant's contention that she therefore had two opportunities to sue, one based on the injuries occurring in 1982 and 1983, and another in 1986 when she became aware that the cancer had spread. *Colbert, supra,* 641 A.2d at 475. We stated that her "position might be more persuasive if metastasis were the only injury she claimed." *Id.* at 475 n. 12. However, given that appellant had already suffered grievous injury in 1982 and 1983 as a result of the negligence, we concluded that the law did not permit her to delay those claims based on her decreased chance of survival until "after that ninety percent probability had become a *fait accompli.*" *Id.* at 475.

Applying the reasoning of *Colbert* to the present case, we hold that appellants' malpractice actions accrued around the times of their hospitalizations because it was then that they gained *some* knowledge of appellees' malpractice, and of their injuries. The fact that appellants lacked full knowledge of the extent of appellees' alleged wrongdoing does not alter that conclusion. Thus, we reject appellants suggestion that they were not on notice of appellees' malpractice until they learned of the alleged nationwide conspiracy.

### B.  Fraud Claims

Appellants also contend that the trial court erred in concluding that "any knowledge of

---

19.  We are also of the view that appellants have overstated their case.  We agree that *some* of the alleged malpractice—such as intentional misdiagnoses to maximize coverage or omissions of chart notations indicating that hospitalization was unnecessary—may not have been discernible to appellants at the time of their hospitalizations. However, the interrogatory responses of each of the appellants relate obvious acts of malpractice—including emotional and physical abuse, lack of treatment, improper placement, and mishandling of medication—that should have been,

and were, evident to appellants around the times of their hospitalizations.  Thus, each appellant had "some evidence" of appellees' malpractice around the time of his or her hospitalization.

20.  We also considered and rejected the cause in fact rule, which requires only knowledge of the existence of an injury and its cause, but not any evidence of wrongdoing, for a malpractice claim to accrue. *Bussineau,* 518 A.2d at 429.

some injury, mistreatment or wrongdoing is sufficient as a matter of law to constitute notice under the discovery rule of all claims, causes of action and injuries." They also argue:

> The Trial Judge failed to consider whether th[e] facts or beliefs which the Plaintiffs did possess were sufficient, in the light most favorable to them, to have enabled them to have discovered the nature and extent of not only their negligence (malpractice) claims and injuries, but also the nature and extent of their claims and injuries arising out of the fraudulent conspiracy, of which they were not even remotely aware, nor were likely to have discovered had any of them pursued the claims of which they were aware prior to the time the nature and scope of the fraudulent conspiracy came to light.

Appellants maintain, in other words, that knowledge of negligence/medical misconduct did not constitute knowledge of the fraudulent conspiracy, which appellants did not become aware of until February 1995, when they were contacted by their present counsel and apprised of appellees' nationwide criminal conduct.[21]

█ Appellants rely on two cases to support their contention that, although the negligence/medical malpractice claims may be barred by the statute of limitations, the fraud-based claims are not. One of those cases, *Richards v. Mileski*, 213 U.S.App. D.C. 220, 662 F.2d 65 (1981), involved a federal employee who resigned in 1955 under duress of false charges of homosexual activity. The employee did not discover until some twenty-three years later, after receiving a copy of a memorandum pursuant to a Freedom of Information Act (FOIA) request, that the false charges were *intentionally fabricated* by investigators and Richards' superiors. The action filed named only the investigators and the employee's superiors as defendants. The Court of Appeals for the District of Columbia Circuit ruled that Richards' suit, filed in a timely manner[22] following receipt of the memorandum, was not necessarily barred by the statute of limitations[23] with respect to the "defendants' *knowing* and malicious use of false information to obtain Richards' resignation under duress." *Richards, supra,* 213 U.S.App. D.C. at 224, 662 F.2d at 69 (emphasis in original).

The *Richards* court distinguished claims arising from this "deliberate conspiracy against him" from claims based on "the falseness of the homosexuality charges against Richards, or the government's impropriety in coercing him to resign." *Id.* The court noted that claims such as wrongful discharge or coerced resignation were known to Richards in 1955 and were clearly barred by the statute of limitations when Richards filed suit on July 13, 1979. However, Richards' claims against the individual employees—which included fraudulent misrepresentation and defamation of character—were not barred by the statute of limitations, because, prior to receipt of the memorandum, Richards could

---

**21.** One appellant, Kathryn James, concedes she saw a television news program in 1991 about a lawsuit against PIA concerning conduct that occurred in Texas similar to the conduct alleged here. Because we conclude, for statute of limitations purposes, that all of the appellants had notice of appellees' alleged tortious conduct around the time of their hospitalizations, we need not consider whether the television program alone would have provided James with sufficient notice of her claims against PIW for her cause of action to accrue.

**22.** Richards filed his suit on July 13, 1979, less than one year after learning that the charge was fabricated by his supervisors. The applicable statute of limitations was one year for some of his claims, and three years for others. *Richards, supra,* 213 U.S.App. D.C. at 223 nn. 5 & 7, 662 F.2d at 68 nn. 5 & 7.

**23.** The court ruled that the doctrine of equitable tolling was potentially applicable due to the defendants' fraudulent concealment of the facts underlying Richards' claim. *Richards, supra,* 213 U.S.App. D.C. at 224, 662 F.2d at 69. Under this doctrine, "[t]he statutes are tolled until the plaintiff, employing due diligence, could have discovered the facts that were fraudulently concealed." *Id.* Therefore, the appeals court reversed the trial court's dismissal of the suit on statute of limitations grounds and remanded for further proceedings. The court held that the statute of limitations would be tolled until July 19, 1978, the date Richards learned of the facts giving rise to his suit, assuming the defendants did not establish "that Richards knew or should have known of the defendants' tortious conduct prior to July 19, 1978." *Id.* at 227, 662 F.2d at 72.

not be charged with the knowledge that the employees intentionally fabricated the false information.[24] Even assuming application of the analytical framework in *Richards* and *Richardson*, which we have no occasion to adopt or reject in this case, we are unpersuaded by appellants' reliance on those cases for reasons which we will discuss below.

### 1. Appellants Had Notice of Fraud Claims Around Time of Their Hospitalization

■ Unlike the plaintiffs in *Richards* and *Richardson*, appellants were on notice of their fraud claims against appellees around the time of their hospitalizations. For example, the trial court found, primarily based on appellants' concessions, that appellants "suspected that [appellees'] conduct was fraudulent or inappropriate at the time of their hospitalization or discharge." All five appellants indicated that they suspected, around the time of their hospitalizations, that the actions of PIW staff were driven by insurance considerations rather than medical necessity.

To illustrate, Kathryn James suspected during her repeated hospitalizations that she was being kept at PIW because her insurance had not run out rather than for medical reasons. See *supra* at 466. Paris Morton's mother suspected, during her son's first hospitalization, that the length of his stay at PIW was insurance-driven when he was discharged after exactly thirty days, which was just when his medical benefits ran out, and again when he was admitted as an inpatient despite her requests for outpatient treatment and then released exactly thirty days later. The other three appellants had similar suspicions based on their experiences at PIW. See *supra* at 466 – 67. Thus, around the

time of their hospitalization or discharge, all appellants had "some knowledge of [appellees' fraudulent behavior]." *Bussineau, supra*, 518 A.2d at 430.

### 2. Fraud Claims Intertwined With Negligence Claims

■ In our view, appellants' fraud claims are completely dependent upon and intertwined with their medical malpractice claims. *See Saunders v. Nemati*, 580 A.2d 660, 663 (D.C.1990) (acts constituting assault and battery "subsumed" into acts constituting intentional infliction of emotional distress). Like the plaintiff in *Saunders*, whose emotional distress claim stemmed directly from the defendant's intentional verbal abuse and the psychological harm it caused her, appellants' fraud claims rest principally on the acts of medical malpractice they allege and the injuries suffered as a result. Indeed, appellants claim no injury that is different from what is appropriate to and addressable in a medical malpractice action. Moreover, unlike the plaintiff in *Grigsby v. Johnson*, 1996 WL 444052, U.S. Dist. LEXIS 7034 (1996), whose emotional distress claims and assault/battery claims addressed separate and distinct interests, the right to be free from psychological and physical harm, respectively, the interests protected by appellants' fraud claims are identical with the interests protected by their medical malpractice claims. Specifically, both sets of appellants' claims implicate the right to be free from inappropriate, inadequate, abusive, and injurious medical treatment. The injuries for which appellants seek damages under the two sets of claims are also identical. Thus, appellants' fraud claims accrued at the same time as their claims for medical malpractice.[25]

---

**24.** The other case, *Richardson v. U.S. News & World Report, Inc.*, 639 F.Supp. 595 (D.D.C. 1986), relies on *Richards* in holding that appellants' negligence claims were barred by the statute of limitations but their fraud claims were not, because they could not be held to have been on notice of the facts underlying the intent-based claims.

**25.** Once appellants discovered the motivation for the malpractice, and that it was intentional and it occurred in an outrageous way, the fact that

punitive damages would have been available, *see Dyer v. William S. Bergman & Assocs.*, 657 A.2d 1132, 1139 n. 10 (D.C.1995), does not alter the fact that the malpractice suit must be filed within the prescribed limitations period. We need not address whether the availability of significantly different damages (*e.g.*, punitive or treble damages) for a different cause of action would so distinguish causes of action based on the same factual circumstances as to make their accrual different.

**472**

## III. LIABILITY OF CORPORATE ENTITIES

■ Finally, appellants have tangentially argued that even if the statute of limitations bars their suit against PIW and their treating doctors, it should not be found to bar a similar suit against NME or PIA and the corporate leaders who allegedly masterminded the fraudulent scheme since, arguably, an individual plaintiff could not be expected to be on notice of activities at such high levels. We reject that contention.

In *Diamond v. Davis,* 680 A.2d 364, 380 (D.C.1996) (footnote omitted) (citing *Fitzgerald v. Seamans,* 180 U.S.App. D.C. 75, 84, 553 F.2d 220, 229 (1977), and *Richards, supra,* 213 U.S.App. D.C. at 224–25, 662 F.2d at 69), we adopted the conclusion of the Court of Appeals for the District of Columbia Circuit that

> the plaintiff's knowledge of wrongdoing on the part of one defendant did not cause accrual of his action against another, unknown defendant responsible for the same harm, unless the two defendants were closely connected, such as in a superior-subordinate relationship.

We further stated:

> We adopt the Circuit's approach with the understanding that whether the relationship of the defendants is sufficiently close to cause accrual should generally be considered as a question of fact which may be imputed to the plaintiff by the ... standard of reasonable diligence [which we apply in all discovery rule cases regardless of whether or not fraud is present] under the circumstances.

*Id.* As we have already noted, appellants acknowledged that when they were hospitalized they suspected that the actions of their doctors and of the PIW staff were influenced by the extent of the patients' insurance coverage. Such concern would suggest the intervention of corporate financial considerations in medical decisions. Thus, the nature of the behavior put appellants on notice of the close relationship between the doctors and PIW and NME.

For the foregoing reasons, the trial court's award of summary judgment to appellees is hereby

*Affirmed.*